[Cite as *State v. Chapman*, 2022-Ohio-2853.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
ROSS COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. 21CA3742 |
| v. | : | |
| SAMUEL CHAPMAN, | : | DECISION AND JUDGMENT ENTRY |
| Defendant-Appellant. | : | |

_____

APPEARANCES:

Max Hersch and Stephen Hardwick, Assistant State Public
Defenders, Columbus, Ohio, for appellant.

Jeffrey C. Marks, Ross County Prosecuting Attorney, and Pamela
C. Wells, Ross County Assistant Prosecuting Attorney, for
appellee.
_____

CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:8-11-22
ABELE, J.

{¶1} This is an appeal from a Ross County Common Pleas
Court judgment of conviction and sentence. A jury found Samuel
Chapman, defendant below and appellant herein, guilty of four
offenses: (1) attempted murder, in violation of R.C. 2923.02;
(2) kidnapping, in violation of R.C. 2905.01; (3) grand theft,
in violation of R.C. 2913.02; and (4) tampering with evidence,
in violation of R.C. 2921.12. The trial court merged the grand-
theft and tampering-with-evidence offenses and sentenced

appellant to serve consecutive terms of imprisonment with a minimum term of 21 years and maximum of 26 years.

{¶2} Appellant assigns the following errors for review:

FIRST ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED STRUCTURAL ERROR WHEN IT EXCLUDED A PROSPECTIVE JUROR BECAUSE OF THE JUROR'S DISABILITY."

SECOND ASSIGNMENT OF ERROR:

"THE TRIAL COURT ERRED BY NOT MERGING MR. CHAPMAN'S CONVICTIONS FOR ATTEMPTED MURDER AND KIDNAPPING."

THIRD ASSIGNMENT OF ERROR:

"THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT SENTENCED MR. CHAPMAN TO AN INDEFINITE SENTENCE UNDER THE UNCONSTITUTIONAL REAGAN TOKES LAW."

{¶3} On April 1, 2020, Jennifer Lambert found Barbara Martin bloodied and abandoned in an open field located approximately ten feet from the side of a road. Martin told Lambert that a man stabbed her and tried to drag her to a field. Lambert called 9-1-1. After medical personnel and law enforcement officers responded to the scene, officers identified appellant as a suspect and apprehended him later that day.

{¶4} A Ross County Grand Jury subsequently returned an indictment that charged appellant with attempted murder,

kidnapping, grand theft, and tampering with evidence.  Appellant

entered not guilty pleas.

{¶5}  On February 23 through 25, 2021, the trial court held

a jury trial.  After the parties completed their opening

statements, the trial court noted, on the record and outside of

the jury's presence, that an issue had arisen before jury

selection.  When the court asked defense counsel if they wished

to add anything to the record, counsel responded affirmatively

and the court outlined what had occurred before jury selection

began:

> The court sent out as a matter of record a set of
> jury questionnaires.  We provide those questionnaires to
> counsel prior to a trial.  We also give a list of all of
> the jurors [sic] names.  One of the jurors that was
> listed on this month's questionnaires was a juror by the
> name of [A.B.].  The Judge, I am very familiar with
> [A.B.].  He is the manager at Unioto for the basketball
> sports teams.  He has Down's Syndrome and when he was
> twenty-five years old or so he was still the manager of
> the basketball team.  He works also at Kroger Grocery.
> He doesn't recall my name whenever I see him out, but he
> always remembers that I am David's dad and he will say,
> "Hello David's Dad."  I believe his duty or his job there
> is a courtesy clerk is what they call him.  Clearly, his
> questionnaire was filled out by his mother and he signed
> the questionnaire.  So having said all of that it was my
> intention to leave him on this jury and allow it to go
> forward and allow him to go through the voir dire
> process.  I had some very large concerns based upon my
> knowledge of him of whether he would be able to
> understand or comprehend what was going on and whether
> or not he would be so easily persuaded or swayed by
> others but that was only a concern I was going to address
> if the counsel decided to do so.  However, his father
> came here today instead and with counsel in chambers

with me, his father appealed to the court that he not serve on the jury. He indicated that [A.B.]'s focus right now is the upcoming baseball season and nothing else. I indicated to him what the facts of the case were and the father indicated it would be not in [A.B.]'s interest to hear that sort of evidence or have that. With that in mind, I then said thank you and I indicated to counsel that I was going to excuse him from service. Mr. Marks did not object to that. Frankly, I don't recall if the defense objected but I told them I would give them the opportunity to object if they wished to do so and certainly make a record of it. First, does counsel believe that is an accurate recitation of what happened this morning? Mr. Marks?

{¶6} The prosecutor stated that the court's recitation was accurate, and defense counsel agreed. Defense counsel then clarified that they did not object in chambers because the court had indicated that it would give defense counsel the chance to object later.

{¶7} Defense counsel then objected on the record to the trial court's decision to exclude A.B. from jury service before voir dire. Defense counsel suggested that the court's decision "was a bit premature" and that the voir-dire process would have revealed whether A.B. is capable of being seated as a juror. The court, however, noted defense counsel's objection and stated that it already "made the decision about it" and did not believe it needed to overrule appellant's objection. Thus, the court proceeded with the trial.

**{¶8}** The state's first witness, Angel Blevins, testified that on April 1, 2020 she worked at a Valero gas station. Blevins explained that Barbara Martin visited the store nearly every day and she was familiar with Martin.[1] During the early morning hours of April 1, 2020, Martin entered the store. At that time, a man also was inside the gas station. Blevins did not know the man's name, but she noticed him inside the store on previous occasions. At trial, Blevins identified the man as appellant.

**{¶9}** Blevins stated that, after Barbara Martin completed her purchase, she exited the store, walked to her vehicle and appellant followed. Martin returned to the store, and appellant again followed. When Martin asked Blevins about giving appellant a ride, Blevins said she did not see any issue with giving appellant a ride. Martin and appellant then returned to Martin's vehicle and sat for a moment before leaving.[2]

**{¶10}** Jennifer Lambert testified that, on April 1, 2020 while driving on Stone Road, she heard a person scream and observed Martin lying in a field about ten feet from the

---

[1] Before trial, Martin passed away from causes unrelated to the charges filed against appellant.

[2] During Blevins' testimony, the state played store surveillance footage. Blevins stated that the video footage accurately depicted the sequence of events that occurred the morning of April 1, 2020.

roadway. Lambert noted that Martin was waving her hand, so she stopped to see if she needed assistance. When Lambert approached Martin, she noticed blood all over Martin's hands and that she held her hands by her neck. Martin repeated "that he stabbed her."

{¶11} Jennifer Lambert attempted to help Martin, and, as she did, Martin turned and looked up the hill. When Lambert noticed a gold Chevrolet vehicle approach, Martin told Lambert to run. At that point, the vehicle's driver stopped, opened the door, exited and walked to the front of the car. Lambert said the driver was so close she could have reached out and touched him.

{¶12} Jennifer Lambert further testified that Martin kept telling Lambert to run and stated "he was going to kill me too." Lambert then yelled at the man and told him to return to the vehicle and that she had called the police. Lambert explained that the man "just kind of looked over at [Martin], shrugged his shoulders like this, and got back in the car." When the man returned to the vehicle, he drove up the hill.

{¶13} Ross County Sheriff's Deputy Mitchell Reffett responded to the scene and found Martin, Lambert, and Jason Jones (another person who stopped to help) present. Reffett administered first aid and asked Martin what had happened. Martin advised the deputy "that a guy had stabbed her, and that

she had fought him and he was trying to drag her into the field that was located next to the road before he took off in the car." Reffett stated that he noticed a large quantity of blood in the area and the field Martin described is "a marshy area, like a pond, a wetland area."

{¶14} The state presented additional witnesses to prove that appellant is the individual who stabbed Martin. Lindsey White stated that on April 1, 2020, appellant appeared at her house and demanded that White let him inside to talk to White's boyfriend, Marshond. Although White told appellant that Marshond was asleep, appellant nevertheless walked into the house and went to the sink to wash his hands. Appellant then asked White to wake up Marshond because appellant needed clothes. White testified that appellant's presence made her nervous, so she sent a message to a neighbor, Cyndi Hickman, that appellant was at her house and "something didn't feel right."

{¶15} Lindsey White also stated that Marshond woke up and her neighbor, Cyndi Hickman, arrived at the house. White explained that she and Hickman left the house and drove to a store to purchase some items and as they did, they observed "a body getting picked up out [of] the ditch." Shortly thereafter,

White and Hickman reported their suspicions about appellant to law enforcement officers.

{¶16} Officers searched the area near White's residence and located Martin's vehicle, a gold Chevrolet sedan, hidden in the woods. Not long after, they spotted appellant running between two strips of airfield at the Ross County Airport.

{¶17} Eventually, officers captured appellant and found a knife in his possession. Appellant told one officer, Ross County Sheriff's Detective Stanley Addy, that "a lady attacked" him with a knife. When Addy pointed out to appellant that appellant carried a knife, he responded, "not that knife." Addy then advised appellant of his *Miranda*[3] rights and appellant retorted, "You have the right to shut the F up."

{¶18} After the state presented its case, including several items of physical evidence to link appellant to Martin's stabbing, appellant chose to testify in his defense. Appellant explained that he spoke with Martin at the gas station about "a ride home," but denied he left the gas station in Martin's vehicle. Instead, appellant said he purchased heroin from a person named Derek McCallister and he traded his coat with McCallister in exchange for heroin. Appellant testified that he

---

[3] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

then walked across the street "and went under the viaduct and snorted a little bit of the heroin." Afterward, appellant visited a friend's house and later met a "street walker" who drove him to Stone Road.

**{¶19}** Appellant explained that once on Stone Road, he visited Don Tilton's residence but Tilton's girlfriend, Angel, "was flipping out." Appellant indicated that Tilton and Angel acted "weird" about appellant at their house, and Tilton threatened him with a gun and Angel a butcher knife. Appellant also testified that Tilton gave him a Timberwolf knife, the knife officers found in his possession.

**{¶20}** Appellant claimed that he "vaguely" remembers contact with law enforcement officers, but did recall running from officers and did so because of previous negative interactions with officers. Appellant also testified that he did not enter Barbara Martin's car at any point on April 1, 2020, did not kidnap her, attempt to murder her, or harm her in any way. Appellant claimed that, when Martin was in her vehicle at the gas station, "someone" already was in Martin's car.

**{¶21}** After hearing the evidence, the jury found appellant guilty of attempted murder, kidnapping, grand theft, and tampering with evidence. At sentencing, the trial court merged the grand theft offense with the tampering offense and sentenced

appellant to serve (1) an indefinite 10-year prison term for attempted murder, (2) an indefinite 10-year prison term for kidnapping, and (3) a 12-month prison term for tampering with evidence. The court further ordered that all of the sentences be served consecutively to one another and ordered appellant be sentenced to a minimum term of 21 years and a maximum term of 26 years. This appeal followed.

I

**{¶22}** In his first assignment of error, appellant asserts that the trial court erred by excluding a prospective juror based on the juror's disability. Appellant contends that the summary dismissal of the juror violated the Equal Protection Clause and is a structural error that mandates a reversal of the trial court's judgment.

**{¶23}** Initially, we point out that appellant did not object to the juror's dismissal before the court decided to excuse the juror. The record does not indicate, for example, that appellant objected when the parties conferred in the judge's chambers when the judge considered the juror's father's plea to excuse the juror. Moreover, appellant did not object when the court indicated that it intended to excuse the prospective juror due to the juror's Down Syndrome and the juror's father's belief that the juror could not cope with the demands of sitting on the

jury. Appellant also did not object at any point during voir dire or prior to jury selection. Instead, appellant objected after the jury had been seated. Thus, because appellant did not request the trial court to allow defense counsel to voir dire the juror, appellant did not object at a time when the court could have corrected any error. Thus, under these circumstances, we do not believe that appellant properly preserved the alleged error. *State v. McAlpin*, ___ Ohio St.3d ___, 2022-Ohio-1567, ___ N.E.2d ___, ¶ 110 (defendant's failure "to object during voir dire to the state's use of its challenges * * * * forfeited his challenge absent a showing of plain error").

{¶24} Appellant claims, however, that he properly objected and asserts that, because the trial court "did not instruct [defense counsel] to object at the first opportunity," "defense counsel appropriately waited for the trial court to bring it up." Appellant notes that counsel did object on the record when the court asked counsel whether they wished to object to the court's decision to dismiss the juror. The court pointed out on the record that, while in chambers, the prosecutor did not object, and the court did not "recall if the defense objected but I told them I would give them the opportunity to object if they wished to do so and certainly make a record of it."

Defense counsel stated, however, that they did not object in chambers in light of the court's statement that it would give them the chance to object on the record.

**{¶25}** Nevertheless, our review of the record reveals that appellant did not object at a time when the trial court could have corrected any error. By the time appellant objected, the juror had been dismissed and the jury seated. Therefore, we believe that appellant forfeited the right to raise this issue on appeal. *State v. Murphy*, 91 Ohio St.3d 516, 524-25, 747 N.E.2d 765 (2001) (defendant forfeited right to argue court erred by dismissing jurors without granting counsel opportunity to voir dire jurors when defendant "did not request an opportunity to voir dire either one").

**{¶26}** We also observe that appellant did not argue, during the trial court proceedings, that dismissing the juror violated the Equal Protection Clause. It is well-settled that a party may not raise for the first time on appeal new issues or legal theories. *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 43, 322 N.E.2d 629 (1975). Thus, a litigant who fails to raise an argument before the trial court forfeits the right to raise that issue on appeal. *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 30 ("an appellant generally may not raise an argument on appeal

that the appellant has not raised in the lower courts"); *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 21 (defendant forfeited constitutional challenge by failing to raise it during trial court proceedings); *Gibson v. Meadow Gold Dairy*, 88 Ohio St.3d 201, 204, 724 N.E.2d 787 (2000) (party waived arguments for purposes of appeal when party failed to raise those arguments during trial court proceedings); *State ex rel. Gutierrez v. Trumbull Cty. Bd. of Elections*, 65 Ohio St.3d 175, 177, 602 N.E.2d 622 (1992) (appellant cannot "present * * * new arguments for the first time on appeal"); *accord State ex rel. Jeffers v. Athens Cty. Commrs.*, 4th Dist. Athens No. 15CA27, 2016-Ohio-8119, 2016 WL 7230928, fn.3 (failure to raise argument in trial court results in waiver of argument for purposes of appeal); *State v. Anderson*, 4th Dist. Washington No. 15CA28, 2016-Ohio-2704, ¶ 24 ("arguments not presented in the trial court are deemed to be waived and may not be raised for the first time on appeal").

**{¶27}** When a criminal defendant forfeits the right to assert an error on appeal, an appellate court applies plain-error review. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, 38 N.E.3d 860, ¶ 21-22. Crim.R. 52(B) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

ROSS, 21CA3742

Crim.R. 52(B) thus permits a court to recognize plain error if the party claiming error establishes (1) that "'an error, i.e., a deviation from a legal rule'" occurred, (2) that the error is a plain or "'an "obvious" defect in the trial proceedings,'" and (3) that this obvious error affected substantial rights, i.e., the error "'must have affected the outcome of the trial.'" *Id.* at ¶ 22, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002); *accord United States v. Dominguez Benitez*, 542 U.S. 74, 76, 82, 124 S.Ct. 2333, 159 L.Ed.2d 157 (2004) (under plain-error review, defendant typically must establish "'reasonable probability that, but for the error,' the outcome of the proceeding would have been different"). For an error to be "plain" or "obvious," the error must be plain "under current law" "at the time of appellate consideration." *Johnson v. United States*, 520 U.S. 461, 467, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *accord Henderson v. United States*, 568 U.S. 266, 279, 133 S.Ct. 1121, 185 L.Ed.2d 85 (2013); *Barnes*, 94 Ohio St.3d at 27, citing *United States v. Olano*, 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (for error to be plain, it must be obvious error under current law); *State v. G.C.*, 10th Dist. Franklin No. 15AP-536, 2016-Ohio-717, ¶ 14. Moreover, even when a defendant demonstrates that a plain error or defect affected his substantial rights, the Ohio Supreme Court has

"'admonish[ed] courts to notice plain error "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."'" *Rogers* at ¶ 23, quoting *Barnes*, 94 Ohio St.3d at 27, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus; *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16 ("reversal must be necessary to correct a manifest miscarriage of justice"). Consequently, an appellate court has discretion to notice plain error but "is not required to correct it." *Rogers* at ¶ 23.

{¶28} After our review in the case sub judice, we do not believe that any error – obvious or otherwise – occurred. The plain-error doctrine, therefore, has no applicability to the case at bar.

{¶29} "The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws.'" *Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985), quoting *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982); *see also* Article I, Section 2, Ohio Constitution ("All political power is inherent in the people. Government is instituted for their equal protection and benefit."). The Equal Protection Clause

"is essentially a direction that all persons similarly situated should be treated alike." *Cleburne*, 473 U.S. at 439; *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, 839 N.E.2d 1, 6 (Equal Protection Clause "require[s] that individuals be treated in a manner similar to others in like circumstances").

{¶30} The Equal Protection Clause does not, however, "forbid the state from treating different classes of persons differently." *Matter of Adoption of Y.E.F.*, 163 Ohio St.3d 521, 2020-Ohio-6785, 171 N.E.3d 302, ¶ 17, citing *Eisenstadt v. Baird*, 405 U.S. 438, 446-447, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972), citing *Reed v. Reed*, 404 U.S. 71, 75-76, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971).

> But a classification must not be arbitrary; it "'must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.'" *Reed* at 76, 92 S.Ct. 251, quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920).

*Id.*

{¶31} A court that is determining whether a particular classification violates the Equal Protection Clause applies "'different levels of scrutiny to different types of classifications.'" *State v. Thompson*, 95 Ohio St.3d 264, 2002-Ohio-2124, 767 N.E.2d 251, ¶ 13, quoting *Clark v. Jeter*, 486 U.S. 456, 461, 108 S.Ct. 1910, 100 L.Ed.2d 465 (1988). Under

rational-basis review, a classification must "be rationally related to a legitimate government purpose." *Id.*, citing *Clark* at 461, 108 S.Ct. 1910. Classifications that involve a suspect class or that affect a fundamental constitutional right must "be narrowly tailored to serve a compelling state interest." *Id.*

**{¶32}** In the case at bar, appellant contends that the trial court's decision to excuse the juror before voir dire based upon the juror's disability violated the Equal Protection Clause. He asserts that summarily dismissing a juror with a disability, like Down Syndrome, before voir dire deprives that juror of the equal protection of the law.

**{¶33}** First, we emphasize that "all persons, including the disabled, have access to the courts and the opportunity to serve on juries." *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649, 925 N.E.2d 584, 2010 WL 756988, ¶ 20. "The duty of jury service falls on all citizens, and, therefore, it is 'vitally important that the legal system open its doors to each person who desires to serve on a jury.'" Rules of Superintendence for the Courts of Ohio, Appendix B, Ohio Trial Court Jury Use and Management Standards, Standard 1(A). Trial courts thus have an "obligation * * * to reasonably accommodate the special needs of physically handicapped jurors." Commentary to Standard 1.

ROSS, 21CA3742

{¶34} R.C. 2313.14 applies when a court excuses a person from jury service before voir dire.[4] As relevant here, the statute provides:

> (A) Except as provided by section 2313.15 of the Revised Code, the court of common pleas or the commissioners of jurors shall not excuse a person who is liable to serve as a juror and who is drawn and notified, unless it is shown to the satisfaction of the judge or commissioners by either the juror or another person acquainted with the facts that one or more of the following applies:
> * * * *
> (4) The prospective juror has a mental or physical condition that causes the prospective juror to be incapable of performing jury service. The court or commissioners may require the prospective juror to provide the court with documentation from a physician licensed to practice medicine verifying that a mental or physical condition renders the prospective juror unfit for jury service for the remainder of the jury year.

{¶35} Here, appellant did not cite any Ohio cases that have examined a trial court's decision to dismiss a juror based upon R.C. 2313.14(A)(4) using an equal-protection analysis. Rather, appellant cites a Maryland Court of Appeals case that construed

---

[4]Additionally, Standard 6 of the Rules of Superintendence for the Courts of Ohio, Appendix B, Ohio Trial Court Jury Use and Management Standards, provides as follows:

> B. Eligible persons who are summoned may be excused from jury service only if:
> 1. Their ability to receive and evaluate information is so impaired that they are unable to perform their duties as jurors and they are excused for this reason by a judge;
> * * * *

a state statute regarding juror qualifications. *Troutman v. State*, 466 Md. 237, 218 A.3d 265 (2019). In that case, the court construed Maryland "statutes that govern jury service" to preclude a trial court from "summarily excus[ing] for cause prospective jurors with disabilities."[5] *Id.* at 261. The court explained, "a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, and, at that particular trial, the particular disability would prevent the prospective juror from providing satisfactory jury service." *Id.* at 261.

**{¶36}** In *Troutman*, before the trial began the trial court excused four jurors with physical limitations that prevented or impeded them from climbing the 25-step staircase to the courtroom. Before excusing the jurors, the trial court questioned each to confirm they would be unable to climb the stairs. The defendant objected to the court's decision to excuse the jurors and, after his conviction, appealed.

---

[5] In *Troutman*, the court recited the applicable statute as follows: "[A]n individual is not qualified for jury service if the individual * * * [h]as a disability that, as documented by a health care provider's certification, prevents the individual from providing satisfactory jury service[.]" *Id.* at 241, quoting Md. Code Ann., Cts. & Jud. Proc. 8-103(b)(3) (1974, 2013 Repl. Vol., 2016 Supp.).

{¶37} On appeal, the defendant argued, in part, that the trial court erred by excusing the jurors without considering whether reasonable accommodations could be made. The appellate court, however, did not agree. In reaching its decision the court held:

> [A] trial court may not summarily excuse for cause prospective jurors with disabilities; instead, a trial court may excuse a prospective juror for cause on a disability-related ground if no reasonable accommodation is possible, and, at that particular trial, the particular disability would prevent the prospective juror from providing satisfactory jury service.

*Id.* at 242. The court further stated that a court that is determining whether "to excuse for cause a prospective juror on a disability-related ground * * * must engage in an individualized, case- and disability-specific inquiry." *Id.* at 264.

{¶38} Applying these principles to the facts, the *Troutman* court concluded that the trial court did not abuse its discretion by excusing "the four prospective jurors who indicated that they were unable to use stairs." *Id.* at 265. The appellate court noted that the trial court individually questioned each juror to determine whether they could ascend the 25-steps to reach the courtroom. Thus, the appellate court rejected the argument that excusing the four prospective jurors constituted an abuse of discretion.

{¶39} Appellant asserts that in the case sub judice the trial court likewise should have questioned the excused juror to ascertain whether his disability rendered him incapable of jury service. Appellant has not, however, cited any Ohio decision that adopted the *Troutman* court's analysis as applied to R.C. 2313.14(A)(4). In fact, appellant's proposed analysis would conflict with the express statutory language contained in R.C. 2313.14(A)(4). Nothing in the Ohio statute requires a trial court to conduct an in-depth, individualized assessment of a prospective juror before dismissing them from service due to a mental or physical condition. Furthermore, the statute does not require trial courts to specifically question a prospective juror before it excuses them from jury service under R.C. 2313.14(A)(4). Rather, the statute's language plainly indicates that "another person acquainted with the facts" (like the juror's father in the case at bar – or even the trial judge who has personal knowledge of the juror) may satisfy the court that a "prospective juror has a mental or physical condition that causes the prospective juror to be incapable of performing jury service."

{¶40} We further note that the Ohio Supreme Court indicated "that a juror's discharge 'on grounds of personal excuse' is a matter 'between the court and the jurors, and with which the

parties can not, of right, interfere.'" *State v. Murphy*, 91 Ohio St.3d 516, 525, 747 N.E.2d 765 (2001), quoting *Bond v. State*, 23 Ohio St. 349, 355, 1872 WL 78 (1872). Furthermore, "[a] party has no right to have any particular juror on the panel." *Id.* Therefore, "'[i]t is no ground for reversal of judgment in a criminal case, that the court, before the day set for trial, discharged some of the jurors in attendance on grounds of personal excuse and upon their unsworn statements * * *.'" *State v. Clemons*, 3d Dist. No. 1-86-36, 1988 WL37129, *6 (Mar. 30, 1998), quoting *Bond* at paragraph three of the syllabus; *accord State v. Nguyen*, 4th Dist. Athens No. 12CA14, 2013-Ohio-3170, ¶ 95. Thus, the erroneous excusal of a juror without voir dire typically constitutes harmless error. *Id.; State v. Van Wormer*, 3rd Dist. Hardin No. 6-92-14, 1993 WL 360427, *2.

{¶41} In the case before us, we believe that the trial court's decision to excuse the juror before voir dire is a matter "'between the court and the juror[], and with which the parties can not, of right, interfere.'" *Murphy*, 91 Ohio St.3d at 525, quoting *Bond*, 23 Ohio St. at 355. Moreover, trial courts have discretion to determine whether a prospective juror should be disqualified for cause. *State v. Thompson*, 141 Ohio St.3d 254, 2014-Ohio-4751, 23 N.E.3d 1096, ¶ 83. Thus,

reviewing courts will not reverse a trial court's decision regarding a challenge for cause unless the trial court abused that discretion. *E.g.*, *Berk v. Matthews*, 53 Ohio St.3d 161, 169, 559 N.E.2d 1301 (1990). "An abuse of discretion is more than a mere error of law or judgment." *Thompson* at ¶ 91; *accord* *State v. Johnson*, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 75. Instead, "'[a] trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary.'" *State v. Keenan*, 143 Ohio St.3d 397, 2015-Ohio-2484, 38 N.E.3d 870, ¶ 7, quoting *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34. An abuse of discretion includes a situation in which a trial court did not engage in a "'sound reasoning process.'" *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). Additionally, "[a]buse of discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *Darmond* at ¶ 34.

{¶42} In the case sub judice, if the abuse of discretion standard applies to a court's decision to dismiss a juror under R.C. 2313.14(A)(4) before voir dire, we do not believe that the trial court abused its discretion. Here, the trial court

discussed its reasoning on the record and explained that the prospective juror does not remember the judge's name when the judge sees him around town. Instead, the juror calls the judge, "David's Dad." The judge indicated he is very familiar with the juror and questioned the juror's capability to be seated as a juror in a criminal trial. Furthermore, the juror's father asked the court to excuse the juror from service because the father did not believe that sitting on this jury would be in the juror's best interest. Consequently, we are unable to conclude that the trial court's excusing the juror before voir dire constitutes an abuse of discretion.

{¶43} To the extent appellant believes that the R.C. 2313.14(A)(4) statutory procedure for excusing a prospective juror from service violates the Equal Protection Clause, we again point out that he did not raise this specific argument before the trial court, nor present this argument in his appellate brief. We therefore will not create this argument. *E.g., State v. Dailey*, 4th Dist. Adams No. 18CA1059, 2018-Ohio-4315, ¶ 43-44, quoting *State v. Palmer*, 9th Dist. Summit No. 28303, 2017-Ohio-2639, ¶ 33 (appellate court does not have a duty to construct argument on an appellant's behalf and will not address "'undeveloped arguments'"); *McPherson v. Goodyear Tire & Rubber Co.*, 9th Dist. Summit No. 21499, 2003-Ohio-7190, ¶ 31

(appellate courts do not have duty to construct or develop arguments to support a defendant's assignment of error).

{¶44} We additionally note that the parties addressed the applicability of *State v. Speer*, 124 Ohio St.3d 564, 2010-Ohio-649, 925 N.E.2d 584*,* to the facts in the case sub judice. The *Speer* court held:

> In deciding a challenge for cause to a prospective juror on the basis of a physical impairment, the court must determine, in light of the specific evidence to be presented, whether any reasonable and effective accommodation can be made to enable the juror to serve. In making that determination, the court must balance the public interest in equal access to jury service against the right of the accused to a fair trial, the latter being the predominant concern of the court.
> The right to a fair trial requires that all members of the jury have the ability to understand all of the evidence presented, to evaluate that evidence in a rational manner, to communicate effectively with other jurors during deliberations, and to comprehend the applicable legal principles as instructed by the court. An accommodation made to enable a physically impaired individual to serve as a juror must afford the accused a fair trial.
> A hearing impairment by itself does not render a prospective juror incompetent to serve on a jury, but when the accommodation afforded by the court fails to enable the juror to perceive and evaluate the evidence, the accused is deprived of a fair trial. To avoid such situations, a trial court must determine whether reasonable accommodations will enable an impaired juror to perceive and evaluate all relevant and material evidence, and when no such accommodation exists, the court must excuse the juror for cause.

*Id.* at paragraph one, two, and three of the syllabus.

**{¶45}** We agree with the state that *Speer* does not apply to the case before us. In *Speer*, the defendant challenged for cause a hearing-impaired juror, and the trial court overruled the defendant's challenge. The court indicated it would accommodate the juror's hearing impairment and allow the juror "to sit where she could see the faces of the witnesses" and asked the juror to inform the court "if she missed anything." *Id.* at ¶ 11. The court also permitted the juror "to read the court reporter's real-time transcription of the audio tape." *Id.*

**{¶46}** The Ohio Supreme Court determined that, despite the trial court's attempt to accommodate the juror's hearing impairment, the defendant did not receive a fair trial. The court explained that any accommodation for a hearing-impaired juror must "enable the juror to perceive and evaluate the evidence." *Id.* at ¶ 26. Otherwise, "an accused cannot receive a fair trial." *Id.* The supreme court thus indicated that trial courts that review challenges for cause based upon a juror's hearing impairment must excuse the juror for cause when no "reasonable accommodations will enable an impaired juror to perceive and evaluate all relevant and material evidence." *Id.*

**{¶47}** In *Speer*, the court considered the procedure that trial courts should follow when evaluating challenges for cause to a hearing-impaired juror, or to a juror with a physical disability. The court did not, however, determine that this same procedure applies when trial courts review whether to excuse a prospective juror with Down Syndrome from service under R.C. 2313.14(A)(4). For this reason, we find *Speer* inapposite.

**{¶48}** Consequently, we do not agree with appellant that the trial court erred, plainly or otherwise, by dismissing the juror before voir dire. R.C. 2313.14(A)(4) authorizes a trial court to dismiss a juror upon being satisfied that the juror has a mental or physical condition that caused the juror to be incapable of performing jury service. Here, the trial court obviously was satisfied, based upon the trial judge's familiarity with the prospective juror, as well as the juror's father's statements, that the juror had a mental or physical condition (i.e., Down Syndrome) that caused the juror to be incapable of performing jury service. Therefore, because we do not believe appellant has shown that the trial court erred by choosing to excuse the juror before voir dire, we have not found any error and appellant's structural-error argument is without merit.

**{¶49}** Accordingly, based upon the foregoing reasons, we overrule appellant's first assignment of error.

II

**{¶50}** In his second assignment of error, appellant asserts that the trial court erred by failing to merge his attempted murder and kidnapping convictions.

**{¶51}** The Double Jeopardy Clauses of the Fifth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution, prohibit a criminal defendant from being tried twice for the same offense. The Double Jeopardy Clause prohibits successive prosecutions and multiple punishments for the same offense. *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, ¶ 10.

**{¶52}** "R.C. 2941.25 codifies the protections of the Double Jeopardy Clause." *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 23; *accord State v. Miranda*, 138 Ohio St.3d 184, 2014-Ohio-451, 5 N.E.3d 603; *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 11. The statute provides:

> (A) Where the same conduct by [a] defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶53}** R.C. 2941.25(A) thus allows only a single conviction when the same conduct constitutes "allied offenses of similar import." However, R.C. 2941.25(B) permits multiple convictions when any of the following circumstances apply: (1) the defendant's conduct constitutes offenses of dissimilar import; (2) the defendant's conduct shows that the defendant committed the offenses separately; or (3) the defendant's conduct shows that the defendant committed the offenses with separate animus. *Ruff* at ¶ 13, citing *State v. Moss*, 69 Ohio St.2d 515, 519, 433 N.E.2d 181 (1982).

**{¶54}** Offenses are of dissimilar import "if they are not alike in their significance and their resulting harm." *Id.* at ¶ 21. Additionally, "a defendant's conduct that constitutes two or more offenses against a single victim can support multiple convictions if the harm that results from each offense is separate and identifiable from the harm of the other offense." *Id.* at ¶ 26. Thus, "two or more offenses of dissimilar import exist within the meaning of R.C. 2941.25(B) when the defendant's conduct constitutes offenses involving separate victims or if

the harm that results from each offense is separate and identifiable." *Id.* at ¶ 23.

{¶55} When determining whether offenses are allied offenses of similar import within the meaning of R.C. 2941.25, courts must answer three essential questions: "(1) Were the offenses dissimilar in import or significance? (2) Were they committed separately? and (3) Were they committed with separate animus or motivation? An affirmative answer to any of the above will permit separate convictions." *State v. Earley*, 145 Ohio St.3d 281, 2015-Ohio-4615, 49 N.E.3d 266, ¶ 12, citing *Ruff* at ¶ 31 and paragraphs one, two, and three of the syllabus. Accordingly, courts must consider "[t]he conduct, the animus, and the import." *Id.*

{¶56} We further note that a defendant bears the burden to establish that R.C. 2941.25 prohibits multiple punishments. *State v. Washington*, 137 Ohio St.3d 427, 2013-Ohio-4982, 999 N.E.2d 661, ¶ 18, citing *State v. Mughni*, 33 Ohio St.3d 65, 67, 514 N.E.2d 870 (1987). Additionally, appellate courts review a trial court's R.C. 2941.25 merger decision independently and without deference to the trial court. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

**{¶57}** After our review in the case at bar, we do not believe that the trial court's decision to decline to merge appellant's attempted murder and kidnapping convictions constitutes error. Instead, we believe that the record supports a finding that each of the offenses resulted in a separate and identifiable harm.

**{¶58}** Courts that are determining whether to merge a kidnapping offense and another offense apply the following guidelines established in *State v. Logan*, 60 Ohio St.2d 126, 135, 397 N.E.2d 1345 (1979):

> (a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;
> (b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions.

*Id.* at syllabus; *accord State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 108; *State v. Jones*, 4th Dist. Hocking No. 20CA2, 2021-Ohio-2601, ¶ 30; *State v. Thacker*, 4th Dist. Lawrence No. 18CA21, 2020-Ohio-4620, ¶ 125, appeal not accepted, 161 Ohio St. 3d 1408, 2021-Ohio-106, 161 N.E.3d 687

(all noting that *Logan* analysis still governs merger analysis involving kidnapping and other related offenses).

{¶59} In *Logan*, the defendant was convicted of kidnapping and rape, among other offenses.  The evidence showed that the defendant confronted the victim and offered her some pills, but after the victim refused to accept the pills, the defendant brandished a knife, held it to the victim's throat, then forced her into an alley.  The defendant then walked the victim down the alley, around a corner, down a flight of stairs, then raped her at knifepoint.

{¶60} On appeal to the Ohio Supreme Court, the defendant asserted that his kidnapping and rape convictions constituted allied offenses of similar import and the trial court thus should have merged the convictions.  The supreme court agreed and determined that "the restraint and movement of the victim had no significance apart from facilitating the rape."  *Id.* at 135.  The court additionally found that "[t]he detention was brief, the movement was slight, and the victim was released immediately following the commission of the rape."  *Id.*  The court thus concluded that the defendant did not have "a separate animus to commit kidnapping."  *Id.*

**{¶61}** The court next considered whether "the victim, by such limited asportation or restraint, was subjected to a substantial increase in the risk of harm separate from that involved in the underlying crime." *Id.* The court determined that the facts failed to show "that the asportation of the victim down the alley to the place of rape presented a substantial increase in the risk of harm separate from that involved in the rape." *Id.* Consequently, the court determined that the defendant's kidnapping and rape offenses are allied offenses of similar import. The court further stated, however, that when "murder, the taking of a hostage, or extortion is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense." *Id.; accord State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 90 (noting that *Logan* held that "where murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense").

**{¶62}** Twenty-five years after *Logan*, in *Adams* the Ohio Supreme Court considered whether the defendant's kidnapping and rape offenses should merge. In that case, the defendant entered a home, killed the homeowner, then raped and murdered the homeowner's 12-year-old daughter. A jury found the defendant

guilty of aggravated murder, aggravated burglary, kidnapping, and rape.

{¶63} On appeal to the Ohio Supreme Court, the defendant argued that the trial court erred by failing to merge his kidnapping and rape convictions. The court agreed. The court catalogued the kidnapping and aggravated murder cases in which it previously had found that a separate animus existed:

> In *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 135, the defendant lured the six-year-old victim into his apartment and kept her there long enough to show her some videos before raping and killing her. In *State v. Hartman* (2001), 93 Ohio St.3d 274, 280-281, 754 N.E.2d 1150, "the [d]efendant tied [the victim] to the bed, gagged her, stabbed her one hundred thirty-eight times, slit her throat, and strangled her to death." In *State v. Simko* (1994), 71 Ohio St.3d 483, 489, 644 N.E.2d 345, the defendant "restrained and terrorized" the victim for approximately one-half hour before shooting her when she tried to escape. In *State v. Hill* (1992), 64 Ohio St.3d 313, 595 N.E.2d 884, the defendant forced the 12-year-old victim from a parking lot to a secluded, wooded area, where the victim was repeatedly beaten, raped, and then strangled and set on fire. *See, also, State v. Seiber*, 56 Ohio St.3d 4, 564 N.E.2d 408 (kidnapping found when defendant and accomplice terrorized and held bar patrons at gunpoint for 20 to 30 minutes, preventing them from leaving); *State v. Powell* (1990), 49 Ohio St.3d 255, 261-262, 552 N.E.2d 191 (kidnapping upheld when defendant lured a child from her home to fourth floor of nearby building where he attempted to rape her and ultimately killed her by throwing her from the window).

*Id.* at ¶ 92.

{¶64} After reviewing the foregoing cases, the court concluded that the record did not contain any evidence to show

that the defendant had moved the victim "to or from the bedroom where she was killed or that he tied her up or restrained her in any way other than what was necessary to rape and kill her." *Id.* at ¶ 93. The court also noted that the evidence failed to show that the defendant subjected the victim to any "substantial movement, prolonged restraint, or secretive confinement." *Id.* The court thus determined that the evidence failed to show that the defendant committed the two offenses – kidnapping and rape – with separate animus.

{¶65} In the case at bar, after our review of the record we do not agree with appellant that he committed both the kidnapping and attempted murder with the same animus. The facts in *Logan* and *Adams* are not the same as the facts in the case before us. In *Logan* and *Adams*, the defendant either did not move the victim at all or any movement was slight. In the case sub judice, however, the victim, found ten feet from the side of the road, told one deputy that appellant stabbed her, that she fought back, and that he then tried "to drag her" to the field. Appellant, therefore, committed two separate acts: he stabbed the victim, then transported the victim into a field and attempted to drag her toward a pool of water. The state also introduced a photograph of the area that depicts a large pool of water, or, as Deputy Reffett described it, an area marshy and

like a wetland. Thus, we believe that the evidence adduced at trial shows "substantial movement, prolonged restraint, or secretive confinement." *Adams* at ¶ 93; *Logan*, 60 Ohio St.2d at 135 ("Secret confinement, such as in an abandoned building or nontrafficked area, without the showing of any substantial asportation, may, in a given instance, also signify a separate animus and support a conviction for kidnapping apart from the commission of an underlying offense.").

{¶66} Furthermore, the facts adduced at trial in the case at bar show that dragging the victim into the field "presented a substantial increase in the risk of harm separate from that involved in the [attempted murder]." *Logan*, 60 Ohio St.2d at 135; *see State v. DeWees*, 2018-Ohio-1677, 111 N.E.3d 334, ¶ 40 (11th Dist.) (kidnapping committed separately from rape when defendant forcibly dragged the victim "by the hair and neck, from a public walkway where she was found to a place not visible from that walkway for the purpose of raping her without detection"); *State v. Zanders*, 8th Dist. Cuyahoga No. 99146, 2013-Ohio-3619, ¶ 29 (restraint and force used in "dragg[ing] the victim by the back of her hair from a pay phone across the street and then through an open field to a secluded 'cubbyhole' in the rear yard behind a building * * * was separate and distinct from the force exercised during acts of the rape").

Here, appellant substantially increased the risk of harm to the victim when he abandoned her in a location where passing motorists may have been unable to notice her presence. These facts allowed the jury to infer that appellant attempted to callously discard the victim in a location where she would not be found in time for life-saving treatment.

{¶67} Consequently, we believe that appellant acted with the intent to stab the victim and also with the intent to move the victim to a location hidden from public view. Moving the victim was not incidental to the stabbing. Instead, moving the victim to a location away from the roadway, and dragging her toward a field filled with water, substantially increased the risk that the victim would not be found in a sufficient period of time to administer life-saving emergency medical care. We therefore believe that the evidence shows that appellant had a separate animus as to each offense sufficient to support separate convictions.

{¶68} We also point out that in both *Adams* and *Logan*, the court stated that when "murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense" *Adams* at ¶ 90; *Logan*, 60 Ohio St.2d at 135; *see State v. Jells*, 53 Ohio St.3d 22, 559 N.E.2d 464 (1990) (kidnapping not incidental to murder when defendant

forced victim into van, drove away, and later murdered the victim); *State v. Reynolds*, 80 Ohio St.3d 670, 687 N.E.2d 1358 (1998) (defendant acted with a separate animus in committing murder and kidnapping when victim's hands restrained "for a period of time" before she was killed); *State v. Luff*, 85 Ohio App.3d 785, 621 N.E.2d 493 (6th Dist.1993) (kidnapping and aggravated murder dissimilar when victims led into barn and restrained with duct tape before murder). Although the case at bar involves the crime of attempted murder, not murder, we nonetheless believe that this principle is also applicable to crime of attempted murder. Appellant, therefore, may be convicted of each offense.

{¶69} Accordingly, based upon the foregoing reasons, we overrule appellant's second assignment of error.

III

{¶70} In his third assignment of error, appellant asserts that his sentence, imposed under the Reagan Tokes Law, is unconstitutional. In particular, appellant contends that the sentencing provisions contained within the Reagan Tokes Law

violate (1) the separation-of-powers doctrine, (2) his right to due process, and (3) his right to a jury trial.[6]

**{¶71}** We first point out that appellant did not raise these particular arguments during the trial court proceedings. As we noted earlier, parties may not raise new arguments on appeal. Furthermore, the "[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal." *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus; *accord State v. Buttery*, 162 Ohio St.3d 10, 2020-Ohio-2998, 164 N.E.3d 294, ¶ 7. We may, however, consider forfeited constitutional errors under a plain-error analysis. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 16, citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31, ¶ 377-378; *State v. Alexander*, 4th Dist. Adams No. 21CA1144, 2022-Ohio-1812, ¶ 52.

---

[6] The constitutionality of the Reagan Tokes Law currently is pending before the Ohio Supreme Court. *State v. Hacker*, 166 Ohio St.3d 1462, 2022-Ohio-1104, 185 N.E.3d 94; *State v. Simmons*, 166 Ohio St.3d 1462, 2022-Ohio-1104, 185 N.E.3d 93.

**{¶72}** As we also indicated earlier, to establish plain error a defendant must show that (1) an error occurred, (2) the error was plain or obvious, (3) absent the error the outcome of the proceeding would have been otherwise, and (4) reversal is necessary to correct a manifest miscarriage of justice. *Quarterman* at ¶ 16, citing *State v. Davis*, 127 Ohio St.3d 268, 2010-Ohio-5706, 939 N.E.2d 147, ¶ 29; *Buttery* at ¶ 7.

**{¶73}** Recently, we held that the Reagan Tokes Law does not violate the separation-of-powers doctrine or a defendant's right to due process. *State v. Alexander*, 4th Dist. Adams No. 21CA1144, 2022-Ohio-1812; *State v. Bontrager*, 4th Dist. Adams No. 21CA1139, 2022-Ohio-1367. We see no reason to depart from these holdings. Moreover, many other appellate courts have reached the same conclusion that the Reagan Tokes Law does not violate the separation-of-powers doctrine or infringe on defendants' due process rights. *E.g., State v. Bloodworth*, 12th Dist. Warren No. CA2021-08-073, 2022-Ohio-1899; *State v. Burris*, 5th Dist. Guernsey No. 21CA000021, 2022-Ohio-1481; *State v. Maddox*, 6th Dist. Lucas No. L-19-1253, 2022-Ohio-1350; *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2022-Ohio-470; *State v. Thompson*, 2d Dist. Clark No. 2020-CA-60, 2021-Ohio-4027; *State v. Crawford*, 3d Dist. Henry No. 7-20-05, 2021-Ohio-547.

{¶74} Appellant further argues that the Reagan Tokes Law is unconstitutional because it violates the United States and Ohio constitutional provisions that guarantee criminal defendants the right to a jury trial.[7] Appellant contends that the sentencing provisions permit the Ohio Department of Rehabilitation and Correction (ODRC) to increase a defendant's sentence based upon fact-finding and that this fact-finding violates the principles outlined in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348 (2000), *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428 (2002), and *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004). The principles set forth in these cases generally prohibit increasing a defendant's sentence beyond the maximum term based upon facts that did not form part of the jury's verdict.

{¶75} Although our decision in *Alexander* did not consider whether the Reagan Tokes Law violates a defendant's

---

[7] The Sixth Amendment to the United States Constitution provides: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."

Article I, Section 5 of the Ohio Constitution states: "The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury."

constitutional right to a jury trial, several other courts have considered the issue and have held that it does not. *State v. Leamman*, 2nd Dist. Champaign No. 2021-CA-30, 2022-Ohio-2057, ¶ 12; *State v. Brazo*, 5th Dist. Licking No. 2021 CA 0016, 2022-Ohio-2066; *State v. Thompson*, 2nd Dist. Clark No. 2020-CA-60, 2021-Ohio-4027; *State v. Rogers*, 12th Dist. Butler No. CA2021-02-010, 2021-Ohio-3282.

{¶76} In *Thompson*, the court adopted the *Rogers* court's analysis of the issue in its entirety, and we do the same.

> In *Apprendi*, a jury convicted the defendant of a firearm crime that carried a maximum prison sentence of ten years. However, a judge subsequently sought to impose a longer sentence pursuant to a statute that authorized him to do so if he found, by a preponderance of the evidence, that the defendant had committed the crime with racial bias. *Apprendi* held this scheme unconstitutional: "[A]ny fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" or admitted by the defendant. *Apprendi* at 490. Nor may a state evade this traditional restraint on the judicial power by simply calling the process of finding new facts and imposing a new punishment a judicial "sentencing enhancement." *Id.* at 495. "[T]he relevant inquiry is one not of form, but of effect – does the required [judicial] finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" *Id.* at 494.
> "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." (Emphasis sic.) *Blakely v. Washington*, 542 U.S. 296, 303, 12[4] S.Ct. [2531, 159 L.Ed.2d 403] (2004). "In other words, the relevant 'statutory maximum' is not the maximum sentence a judge may impose after finding additional facts, but the

maximum he may impose *without* any additional findings." (Emphasis sic.) *Id.* at 303-304; *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 121.

In *Ring*, a jury convicted the defendant of felony murder, a crime that carried a maximum sentence of life imprisonment. However, a state statute allowed the trial judge to impose the death penalty if he found, independent of the jury, at least one aggravating factor. Extending the rule of *Apprendi* to capital punishment, the United States Supreme Court found the sentencing scheme violative of the Sixth Amendment right to a jury trial because the required judicial finding of an aggravated circumstance exposed the defendant to greater punishment than authorized by the jury's verdict. *Ring*, 536 U.S. at 609; *State v. McKelton*, 12th Dist. Butler No. CA2017-07-106, 2018-Ohio-1357, ¶ 8.

The Reagan Tokes sentencing scheme is unlike those involved in *Apprendi*, *Ring*, and *Blakely*. Under the Reagan Tokes Law, the trial court imposes both a minimum and a maximum term, and the indefinite prison sentence must be included in the final entry of conviction. R.C. 2929.14 and 2929.144. The only sentencing discretion provided to the trial court lies with the length of the minimum term under R.C. 2929.14(A)(1)(a) and (A)(2)(a); the maximum term is determined based upon a mathematical formula as applied to the minimum term of imprisonment. The maximum prison term component of a Reagan Tokes indefinite sentence is therefore authorized by the jury's guilty verdict and is not based upon factors not submitted to the jury. The defendant is not exposed to greater punishment than that authorized by the jury's verdict.

Once imposed by the trial court, the indefinite sentence is then implemented by ODRC. ODRC simply enforces the sentence imposed by the trial court and its review is limited to determining the offender's release date. R.C. 2967.271 establishes a presumptive release date upon completion of the minimum term. Once the minimum term is served, ODRC may rebut the presumption of release under certain conditions and enforce the remainder of the maximum term already imposed by the trial court. R.C. 2967.271(B). However, "[t]hat codified process does not alter the fact that the trial court imposed a maximum term as calculated under R.C. 2929.144." *State*

*v. Gamble*, 8th Dist. Cuyahoga No. 109613, 2021-Ohio-1810, ¶ 35. In rebutting the presumption of release, ODRC "is not extending the defendant's prison term or imposing its own sentence for violations that occur while the offender is serving the imposed term of imprisonment." *Id.* at ¶ 7. In other words, ODRC does not "increase" a penalty based upon facts not found by a jury but merely administers the sentence already imposed by the trial court for conviction of an offense for which the offender has the right to a jury trial.

In a concurring opinion in *State v. Wolfe*, 5th Dist. Licking No. 2020CA00021, 2020-Ohio-5501, Judge Gwin rejected a challenge to the Reagan Tokes Law as violative of the right to a jury trial, reasoning that

> Under the Reagan Tokes Law, the judge imposes both a minimum and a maximum sentence. Judicial fact-finding is not required. In Ohio, "trial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum sentences." *State v. Kalish*, 120 Ohio St.3d 23, 2008-Ohio-4912, paragraphs 1 and 11. The Department of Rehabilitation and Correction ("DRC") is not permitted to extend a sentence imposed by the trial court beyond the maximum sentence imposed by the trial court. Further, the facts which postpone an inmate's release date are facts found as a result of prison disciplinary proceedings, not the underlying crime. To extend Wolfe's argument to its logical end it would be necessary for the courts to invalidate punishment as a result of internal prison disciplinary proceedings entirely, or require all rule infractions to be tried before a jury.
>
> It is evident that *Apprendi* and its progeny have no application in a prison disciplinary setting where the DRC does not have the authority to extend the inmate's sentence beyond the maximum sentence imposed by the trial judge.

*Id.* at ¶ 61-62.

Unlike the sentencing scheme in *Apprendi* and *Ring*, there is "no discretion exercised by the trial court in imposing the maximum term" under the Reagan Tokes Law, and "nothing within any provision codified under the Reagan Tokes Law permits any branch of government to impose a sentence beyond the maximum term as defined under R.C. 2929.144." *Gamble*, 2021-Ohio-1810 at ¶ 44. The Reagan Tokes Law therefore does not violate an offender's constitutional rights to trial by jury. *Id.;* contra *State v. Delvallie*, 8th Dist. Cuyahoga No. 109315, 2021-Ohio-1809[, opinion vacated on reh'g en banc, 8th Dist. No. 109315, 2022-Ohio-470, 185 N.E.3d 536, appeal allowed, 166 Ohio St.3d 1496, 2022-Ohio-1485, 186 N.E.3d 830].

Rogers at ¶ 14-20.

{¶77} Consequently, based upon the foregoing analysis, we likewise conclude that the Reagan Tokes Law does not violate the constitutional right to a jury trial.

{¶78} Accordingly, based upon the foregoing reasons, we overrule appellant's third assignment of error and affirm the trial court's judgment.

JUDGMENT AFFIRMED.

[Cite as *State v. Chapman*, 2022-Ohio-2853.]

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and that appellee recover of appellant the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Ross County Common Pleas Court to carry this judgment into execution.

If a stay of execution of sentence and release upon bail has been previously granted, it is continued for a period of 60 days upon the bail previously posted. The purpose of said stay is to allow appellant to file with the Ohio Supreme Court an application for a stay during the pendency of the proceedings in that court. The stay as herein continued will terminate at the expiration of the 60-day period.

The stay will also terminate if appellant fails to file a notice of appeal with the Ohio Supreme Court in the 45-day period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of said 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                                          Peter B. Abele, Judge

NOTICE TO COUNSEL
Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.