[Cite as *State v. Holsinger*, 2022-Ohio-4092.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | |
|---|---|---|
| State of Ohio, | : | Case No. 21CA20 |
| Plaintiff-Appellee, | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| Edward S. Holsinger, | : | |
| Defendant-Appellant. | : | **RELEASED 11/15/2022** |

_____

APPEARANCES:

Autumn D. Adams, Adams Legal, LLC, Toledo, Ohio, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and Steven K. Nord, Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.
_____

Hess, J.

{¶1} Edward S. Holsinger appeals from a judgment of the Lawrence County Common Pleas Court convicting him of three counts of aggravated trafficking in drugs and one count of possession of a controlled substance. Holsinger raises four assignments of error asserting that the trial court abused its discretion when it denied his motion for mistrial, that his aggravated trafficking convictions were against the manifest weight of the evidence, that the trial court erred in sentencing him under the Reagan Tokes Law because it is unconstitutional, and that the trial court failed to make the proper findings to order consecutive sentences. For the reasons that follow, we overrule the assignments of error and affirm the trial court's judgment. However, because the trial court made a clerical mistake when it failed to incorporate the consecutive sentence

findings it made during the sentencing hearing into the sentencing entry, pursuant to App.R. 9(E), we instruct the trial court to issue a nunc pro tunc sentencing entry which includes the findings.

## I.  FACTS AND PROCEDURAL HISTORY

{¶2}    The Lawrence County grand jury indicted Holsinger on five counts: (1) aggravated trafficking in drugs on or about March 17, 2021 (Count One); (2) aggravated trafficking in drugs on or about March 23, 2021 (Count Two); (3) aggravated trafficking in drugs on or about April 6, 2021 (Count Three); (4) aggravated possession of drugs on or about April 6, 2021 (Count Four); and (5) possession of a controlled substance on or about April 6, 2021 (Count Five).  Counts One through Four involved methamphetamine and Count Five involved fentanyl.  Holsinger pleaded not guilty, and the matter proceeded to a jury trial.

{¶3}    Detective Sergeant Aaron Bollinger testified that he works for the Lawrence County Sheriff's Office and is an investigator and supervisor for the Lawrence County Drug and Major Crimes Task Force.  Det. Bollinger testified that Shane Blanton was in jail in connection with a drug-related case and had "some domestic issues and menacing issues" and agreed to be a confidential informant for the task force. Blanton made controlled drug buys from Holsinger at the Marlow Bar & Grille on March 17, 2021, and March 22, 2021.  Blanton received $100 compensation for each buy, and Det. Bollinger believed he may have also received favorable treatment from the prosecutor's office.

{¶4}    Det. Bollinger testified that Blanton arranged the buys with Holsinger via Facebook messages. The March 17, 2021 messages were between Blanton and someone with the profile name "Eddie Holsinger" who had no profile picture. Blanton

states that he is coming to "the [M]arlow" and wants to "play a game of 8 ball corner pocket." Blanton later states that he is about to come and is "bringin 175 [sic]." "Eddie" responds, "I'll tell u when [sic]," and later tries to call Blanton, but Blanton missed the call. The March 23, 2021 messages were between Blanton and someone with the profile name of "Eddie" who had a profile picture which is difficult to see in the exhibits. Det. Bollinger testified the picture was of Holsinger. In the messages, Blanton states that he needs "2 balls later." "Eddie" responds, "K." Blanton asks, "[W]here u gonna be at this evening?" "Eddie" responds, "Bar." Blanton asks "how much" and suggests "200." "Eddie" responds "180" "4 esch [sic]." Blanton says, "[S]o 360?" "Eddie" says, "Yes." Blanton requests "a lil better deal than that [sic]," and "Eddie" responds, "170." Det. Bollinger testified that a "ball" or "eight ball" is approximately 3.5 grams of a drug, and in this case, the drug was methamphetamine. Det. Bollinger did not take any measures to verify that the Facebook account or accounts Blanton communicated with belonged to Holsinger.

{¶5} Det. Bollinger testified that Blanton was thoroughly searched before each buy but could not say that the investigator who performed the searches moved Blanton's waistband. Blanton then received buy money and an audio-video recording device monitored by Det. Bollinger in real time. In the video footage from both buys, Blanton seems to interact with other people at the bar before he interacts with Holsinger. During the first buy, Blanton hands money to Holsinger, and Holsinger moves as if putting it in a pant pocket. Given the position of the camera, it is not clear whether Holsinger gives anything to Blanton around the time of the money exchange. However, after accepting the money, Holsinger can be seen unscrewing the top of a fake Budweiser can, hiding a baggie filled with something inside of the can, and then screwing the top back on the can.

During the second buy, Blanton hands money to Holsinger, and when Blanton moves his hand away from Holsinger, a baggie can be seen in Blanton's hand. Blanton later says, "It's a quarter right?" A voice which appears to be that of Holsinger says, "Yeah." Blanton says something like, "Your shit's fire," and the voice which appears to be that of Holsinger responds, "Mine's good." Det. Bollinger testified that a "quarter would be like a quarter ounce" which is the same as seven grams or "two eight balls."

{¶6} On April 6, 2021, Det. Bollinger learned that Holsinger had been arrested by the Ironton Police Department, and Det. Bollinger interviewed him. On the audio recording of the interview, Holsinger tells Det. Bollinger that he was pulled over on the way to a party. Det. Bollinger asks Holsinger about how much "dope" Patrolman Joe Akers got off him, and Holsinger says, "He said 20 grams." Det. Bollinger asks if it was "crystal." Holsinger says, "Yeah." Det. Bollinger asks, "You bad on that stuff?" Holsinger says that he is not and just likes it "once in a while." Det. Bollinger observes that 20 grams is a lot for someone who only likes it once in a while. Holsinger says, "We had about 20 people. We was gonna party." Det. Bollinger asks about where Ptlm. Akers found "it" on Holsinger. Holsinger says that Ptlm. Akers found "it" in a pill bottle under the vehicle. Det. Bollinger asks, "Was it yours, Eddie?" Holsinger says, "Yes, it was." Holsinger also admits to having a "package of H" and "roaches."

{¶7} Det. Bollinger tells Holsinger that his name has been "coming up more" as being a "big time" seller. Holsinger claims he has not sold anything "major" and is the "lowest man on the totem pole." Det. Bollinger says, "Well, you've been selling balls lately." Holsinger says, "Balls?" Det. Bollinger says, "Yeah, three and a half grams." Holsinger says that he "probably sold a couple" but "nobody can afford it." Det. Bollinger

asks whether Holsinger does it "at the bar."  Holsinger says it is "wherever somebody catches me at," which might be at "the bar" or someone's house.  Det. Bollinger says that he has seen Holsinger "holding" a half ounce or ounce at a time and knows that Holsinger keeps it in a Budweiser container with a lid that screws off.  Holsinger says, "Oh."

{¶8}    Blanton testified that he was charged with aggravated trafficking in drugs, possession of drugs, and possession of criminal tools, and he contacted Det. Bollinger because he hoped that if he was "up front and honest about where the drugs came from," he would get "a little leeway" on the charges.  Blanton became a confidential informant for the task force and made two buys from Holsinger.  Blanton contacted Holsinger via Facebook messenger and arranged to buy an eight ball of methamphetamine on March 17, 2021, and two eight balls of methamphetamine on March 23, 2021.  During one buy, Holsinger took the drugs from a diversion safe, i.e., a fake Budweiser can which was hollow inside and had a removeable top, and put the money Blanton gave him in the can.  During the other buy, Holsinger took the drugs from a jacket pocket and put the money Blanton gave him into that pocket.  Blanton testified that usually during drug transactions, money and drugs are exchanged at the same time, almost like the parties are "shaking hands," so the transaction "doesn't look as obvious."  One of the buys from Holsinger happened that way; the other did not but involved "something very similar" which "was quick."  Blanton was paid $100 for each buy and "got help with" his criminal case.

{¶9}    Ptlm. Akers of the Ironton Police Department testified that on April 6, 2021, he conducted a traffic stop of a vehicle in which Holsinger was a back seat passenger.  Sergeant Bradley Spoljaric, who assisted with the stop, instructed Holsinger to exit the vehicle.  As Holsinger did so,  Ptlm. Akers saw a pill bottle fall from a partially unzipped

"black-like container pack" on Holsinger's hip. Ptlm. Akers saw a crystal-like substance in a clear baggie inside the pill bottle, placed Holsinger under arrest, and advised him of his *Miranda* rights. Holsinger initially denied that the substance was his. Ptlm. Akers testified that when he told Holsinger that he saw the pill bottle fall "off of his person," Holsinger said it contained methamphetamine but "[n]ever told" Ptlm. Akers "if it was all his, if it wasn't." Later, Ptlm. Akers testified that at some point, Holsinger said the drugs were his. Ptlm. Akers searched Holsinger and found a digital scale and more baggies containing a crystal-like substance. Holsinger said the substance in the baggies was methamphetamine. Ptlm. Akers weighed all of the methamphetamine recovered during the traffic stop and determined its gross weight was 25 grams. Additional baggies recovered from Holsinger contained heroin and fentanyl. Ptlm. Akers testified that in his experience, people carry drugs in multiple baggies when they are transporting them for sale and distribution to "several different people."

{¶10} Sgt. Spoljaric of the Ironton Police Department testified that during the traffic stop, he observed Holsinger sitting in the back seat of a vehicle. Sgt. Spoljaric saw a partially smoked marijuana joint under Holsinger's right leg and asked him to exit the vehicle. While detaining Holsinger, Sgt. Spoljaric heard what sounded like a pill bottle hit the ground. Holsinger went to pick it up but Sgt. Spoljaric asked him not to and finished detaining him.

{¶11} Analysis by forensic scientists at the Ohio Bureau of Criminal Investigation of the substances recovered from the controlled buys and traffic stop revealed the following. The substance from the first buy contained methamphetamine and weighed 3.2 grams, plus or minus .04 grams. The substance from the second buy contained

methamphetamine and weighed 7.04 grams, plus or minus .04 grams. The crystal-like substances from the traffic stop contained methamphetamine and collectively weighed 20.87 grams, plus or minus .2 grams.  Other substances from the traffic stop contained fentanyl or fentanyl and heroin.

{¶12}  The jury found Holsinger guilty on all counts.  The trial court merged Counts Three and Four, and the state elected to proceed to sentencing on Count Three.  The court sentenced Holsinger to 36 months in prison on Count One, 36 months on Count Two, 8 to 12 years on Count Three, and 12 months on Count Five.  The court ordered that the sentences on Counts One and Two run consecutive to each other and to the sentence on Count Three and that the sentence on Count Five run concurrent to the other sentences.

## II.  ASSIGNMENTS OF ERROR

{¶13}  Holsinger presents four assignments of error:[1]

I.  Reagan Tokes is unconstitutional as it vests sentencing power in the Executive Branch and fails to afford Holsinger access to an attorney at any disciplinary hearing while he is [in] ODRC's custody.

II.  The Trial Court failed to make the proper findings to order consecutive sentences.

III.  It was an abuse of discretion for the Trial Judge to deny the defense's motion for mistrial.

IV.  The convictions were against the manifest weight of the evidence.

For ease of discussion, we address the assignments of error in a different order.

---

[1] Some assignments of error are stated differently in the table of contents and body of Holsinger's appellate brief.  We use the versions in the body of his appellate brief as they more closely match his arguments.

### III.  MOTION FOR MISTRIAL

**{¶14}** In his third assignment of error, Holsinger contends that the trial court abused its discretion when it denied his motion for a mistrial.  "A trial court must declare a mistrial only 'when the ends of justice so require and a fair trial is no longer possible.' " *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, ¶ 198, quoting *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).  "An appellate court reviews an order denying a motion for a mistrial for abuse of discretion."  *Id.*  "A trial court abuses its discretion when it makes a decision that is unreasonable, unconscionable, or arbitrary." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 34.  "[T]o establish that a trial court abused its discretion by failing to grant a mistrial, a 'defendant must demonstrate material prejudice.' "  *State v. Bertram*, 4th Dist. Scioto No. 21CA3950, 2022-Ohio-2488, ¶ 46, quoting *Adams* at ¶ 198.

**{¶15}**  Prior to voir dire, the trial court stated, "So motion to sequester witnesses?" Defense counsel said, "There is a motion to sequester witnesses, Your Honor."  The trial court granted the motion and stated, "Keep your witnesses apart."  After Ptlm. Akers finished testifying, defense counsel asked the court that Sgt. Spoljaric and Ptlm. Akers "remain sequestered from one another until we have had Sergeant Spoljaric's testimony." The court said, "They've been ordered.  A witness sequestration has been ordered." Defense counsel responded, "They're talking currently."  Defense counsel moved for a mistrial or in the alternative, to strike the testimony of Ptlm. Akers.  The trial court denied the motion and stated that it wanted to "see how this plays out" but that defense counsel could renew the motion later.  The prosecutor called Sgt. Spoljaric as the next witness and asked whether he talked to Ptlm. Akers about the case that day.  Sgt. Spoljaric

testified, "No."  The prosecutor then asked Sgt. Spoljaric whether he discussed the case with Ptlm. Akers after he finished testifying, and Sgt. Spoljaric testified, "He walked in, said I'm going this way, and that's the last time I seen him [sic]."  Ptlm. Akers was not recalled and questioned about the interaction.

**{¶16}** Holsinger asserts that the conversation between Ptlm. Akers and Sgt. Spoljaric constituted a "direct violation" of the "order to separate the witnesses."  Holsinger further asserts that it "seems the jury was exposed to this interaction."  He maintains that he was "materially prejudiced" when the violation occurred, and the trial court "failed to verify with both witnesses what was said."

**{¶17}** Holsinger has not shown that he was materially prejudiced by the interaction between Ptlm. Akers and Sgt. Spoljaric.  Evid.R. 615(A) states that "at the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion."  The rule additionally states that "[a]n order directing the 'exclusion' or 'separation' of witnesses or the like, in general terms without specification of other or additional limitations, is effective only to require the exclusion of witnesses from the hearing during the testimony of other witnesses."  Evid.R. 615(A).  "A separation order does not forbid other conduct by witnesses, such as * * * discussing the case with other witnesses outside the courtroom."  2003 Staff Note, Evid.R. 615(A).  "To the extent that a trial court, in the exercise of its discretion, determines to order forms of separation in addition to exclusion, it remains free to do so, but it can do so only by making the additional restrictions explicit and by giving the parties notice of the specific additional restrictions that have been ordered."  *Id.*  "Notice to the parties is

required because, with the exception of contempt, sanctions for violation of the rule tend to have their greatest effect on the parties, rather on the witnesses." *Id.*

{¶18} In this case, the trial court gave a general order directing the parties to keep their witnesses "apart" but did not specify other or additional limitations. Consequently, the court's order was effective only to require the exclusion of witnesses from the courtroom during the testimony of other witnesses. The order was not effective to preclude Ptlm. Akers and Sgt. Spoljaric from conversing after Ptlm. Akers testified. Moreover, the interaction between Ptlm. Akers and Sgt. Spoljaric did not violate the spirit of the separation order because they did not discuss Ptlm. Akers's testimony. Sgt. Spoljaric testified that Ptlm. Akers merely announced the direction he was going.

{¶19} Holsinger cites no legal authority to support his suggestion that the trial court had a duty to question Ptlm. Akers about the interaction to see whether his version of it matched that of Sgt. Spoljaric. And we will not speculate that additional testimony by Ptlm. Akers would have demonstrated material prejudice to Holsinger. Even if Ptlm. Akers and Sgt. Spoljaric had discussed the case, it is difficult to see how the discussion could have impacted the verdict. The most incriminating testimony Sgt. Spoljaric gave after Ptlm. Akers spoke to him was that Sgt. Spoljaric heard what sounded like a pill bottle hit the ground while detaining Holsinger and that Holsinger went to pick it up. Ptlm. Akers testified that he saw the pill bottle fall out of a "container pack" on Holsinger's hip and that eventually Holsinger admitted the bottle contained methamphetamine which was his. And during the recorded interview with Det. Bollinger, Holsinger admitted the methamphetamine in the pill bottle was his. Therefore, even without Sgt. Spoljaric's

testimony there was ample evidence that the methamphetamine in the pill bottle belonged to Holsinger.

{¶20} For the foregoing reasons, we conclude the trial court did not abuse its discretion when it denied the motion for mistrial and overrule the third assignment of error.

## IV. MANIFEST WEIGHT OF THE EVIDENCE

{¶21} In his fourth assignment of error, Holsinger contends that his convictions on Counts One, Two, and Three were against the manifest weight of the evidence. In determining whether a conviction is against the manifest weight of the evidence, an appellate court

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. In order to satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt.

> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence. However, we are reminded that generally, it is the role of the jury to determine the weight and credibility of evidence. " 'A jury, sitting as the trier of fact, is free to believe all, part or none of the testimony of any witness who appears before it.' " *State v. Reyes-Rosales*, 4th Dist. Adams No. 15CA1010, 2016-Ohio-3338, ¶ 17, quoting *State v. West*, 4th Dist. Scioto No. 12CA3507, 2014-Ohio-1941, ¶ 23. We defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility.

(Citations omitted.) *State v. Anderson*, 4th Dist. Highland No. 18CA14, 2019-Ohio-395, ¶ 14-15.

A.  Statutory Provisions

**{¶22}**  R.C. 2925.03(A) states:

No person shall knowingly do any of the following:

(1) Sell or offer to sell a controlled substance or a controlled substance analog;

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

" 'Sale' includes delivery, barter, exchange, transfer, or gift, or offer thereof, and each transaction of those natures made by any person, whether as principal, proprietor, agent, servant, or employee."  R.C. 3719.01(U).  *See also* R.C. 2925.01(A) (stating that as used in R.C. Chapter 2925, "sale" has the same meaning as in R.C. 3719.01).

**{¶23}**  R.C. 2925.03(C)(1) states that "[i]f the drug involved in the violation is any compound, mixture, preparation, or substance included in * * * schedule II, * * * whoever violates division (A) of this section is guilty of aggravated trafficking in drugs."  R.C. 2925.03(C)(1)(c) makes the offense a third-degree felony "if the amount of the drug involved equals or exceeds the bulk amount but is less than five times the bulk amount." R.C. 2925.03(C)(1)(d) makes the offense a second-degree felony "if the amount of the drug involved equals or exceeds five times the bulk amount but is less than fifty times the bulk amount."  Methamphetamine is a schedule II controlled substance and is categorized as a stimulant.  Ohio Adm. Code 4729:9-1-02(C)(2).  R.C. 2925.01(D)(1)(g) defines "bulk amount" as "[a]n amount equal to or exceeding three grams of a compound, mixture, preparation, or substance that is or contains any amount of a schedule II stimulant, or any of its salts or isomers, that is not in a final dosage form manufactured by a person

authorized by the Federal Food, Drug, and Cosmetic Act and the federal drug abuse control laws."

### B. Count One

**{¶24}** Holsinger contends that his conviction on Count One, aggravated trafficking in drugs on or about March 17, 2021, in violation of R.C. 2925.03(A)(1) and (C)(1)(c), was against the manifest weight of the evidence. Holsinger asserts that the state failed to prove beyond a reasonable doubt that he sold or offered to sell methamphetamine to Blanton on that date. Holsinger maintains that the "only evidence" he did so was Blanton's testimony because the video footage from that date does not depict the interactions Blanton had with others before he met with Holsinger or show Holsinger handing any drugs to Blanton. According to Holsinger, the jury lost its way in believing Blanton's testimony because his "credibility is non-existent." Holsinger asserts that "Blanton contacted the police and offered to work with them as a way to save himself from his own bad choices." Blanton "volunteered that he could hand Holsinger to the police department all wrapped up in a bow, and if he failed to do so then his sweet plea bargain deal would go away." Holsinger maintains that Blanton "fulfilled his end of the bargain, so he could get what he wanted."

**{¶25}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse the conviction on Count One. The state presented evidence that on March 17, 2021, Holsinger knowingly sold methamphetamine to Blanton and that the amount of the drug

involved equaled or exceeded the bulk amount but was less than five times the bulk amount. There is evidence that Blanton made arrangements with "Eddie Holsinger" via Facebook to buy an "8 ball" of methamphetamine, i.e., approximately 3.5 grams, that day and in fact met Holsinger. Prior to the meeting, law enforcement searched Blanton and gave him buy money. Blanton testified that Holsinger gave him drugs during the meeting. Laboratory testing revealed that the substance at issue contained methamphetamine and weighed 3.2 grams, plus or minus .04 grams. Blanton recalled that during one buy, Holsinger took the drugs from a fake Budweiser can and then put the buy money inside the can. The video footage from the first buy shows Holsinger in possession of a fake Budweiser can. Given the position of the camera, the footage does not show whether Holsinger removed drugs from the fake can or gave them to Blanton. However, the footage shows Blanton handing money to Holsinger, who appears to put it in a pant pocket, and then shows Holsinger hiding a baggie containing a substance inside the fake can. A few weeks later, Holsinger admitted to Det. Bollinger that he had "probably" sold some "balls" recently. And when Det. Bollinger said he knew Holsinger stored drugs in a fake Budweiser can, Holsinger did not deny the claim and simply said, "Oh."

{¶26} Although Holsinger believes that Blanton is not credible, we find nothing inherently incredible about his testimony that Holsinger sold him the drugs. There is circumstantial evidence to support the testimony, and "we again emphasize that credibility determinations are within the fact finder's province." *State v. McIntosh*, 4th Dist. Gallia No. 17CA14, 2018-Ohio-5343, ¶ 53. The jury "was in the best position to weigh the informant's circumstances when it evaluated the informant's credibility, and we should not

second-guess its decision." *Id.* Based on the foregoing, we conclude the conviction on Count One was not against the manifest weight of the evidence.

### C. Count Two

**{¶27}** Holsinger contends that his conviction on Count Two, aggravated trafficking in drugs on or about March 23, 2021, in violation of R.C. 2925.03(A)(1) and (C)(1)(c), was against the manifest weight of the evidence for the same reasons as Count One. After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse the conviction. The state presented evidence that on March 23, 2021, Holsinger knowingly sold methamphetamine to Blanton and that the amount of the drug involved equaled or exceeded the bulk amount but was less than five times the bulk amount.

**{¶28}** There is evidence that Blanton made arrangements with "Eddie," who used Holsinger's picture as a profile picture, via Facebook to buy "2 balls" of methamphetamine, i.e., approximately 7 grams, that day and in fact met Holsinger. Prior to the meeting, law enforcement searched Blanton and gave him buy money. Blanton testified that Holsinger gave him drugs during the meeting, and as we explained in the previous section, the jury was free to believe Blanton's testimony. Blanton recalled that during one buy, the money and drugs were exchanged at the same time as if he and Holsinger were shaking hands. Blanton also recalled that during one buy, Holsinger took the drugs from a jacket pocket and put the money Blanton gave him into the same pocket. In the video footage of the second buy, Holsinger is wearing a jacket. Blanton hands

money to Holsinger, and when Blanton moves his hand away from Holsinger, a baggie can be seen in Blanton's hand. Blanton and Holsinger then discuss the amount and quality of Holsinger's product. Laboratory testing revealed that the substance at issue contained methamphetamine and weighed 7.04 grams, plus or minus .04 grams. Based on the foregoing, we conclude the conviction on Count Two was not against the manifest weight of the evidence.

### D. Count Three

**{¶29}** Holsinger contends that his conviction on Count Three, aggravated trafficking in drugs on or about April 6, 2021, in violation of R.C. 2925.03(A)(2) and (C)(1)(d), was against the manifest weight of the evidence.[2] Holsinger asserts the state failed to prove beyond a reasonable doubt that he intended to sell the methamphetamine law enforcement found that day. Holsinger highlights the fact that he "stated he had the drugs for a party he was attending with many other people." Holsinger asserts that one can reasonably infer from his statements that he planned to use the methamphetamine "for personal use amongst the friends he was hanging out with, not that he was going to sell the drugs."

**{¶30}** After weighing the evidence and all reasonable inferences, considering the credibility of the witnesses after according the requisite deference to the jury's determinations, we conclude that in resolving evidentiary conflicts, the jury did not clearly lose its way or create a manifest miscarriage of justice so that we must reverse the conviction on Count Three. The state presented evidence that on April 6, 2021, Holsinger

---

[2] One line of the indictment contains a scrivener's error misidentifying the pertinent code sections as R.C. 2925.11(A)(2) and (C)(1)(d).

knowingly transported methamphetamine when he knew it was intended for sale or resale by him and that the amount of the drug involved equaled or exceeded five times the bulk amount but was less than fifty times the bulk amount. Ptlm. Akers testified that during the traffic stop that day, he saw a pill bottle, which contained a crystal-like substance inside a clear baggie, fall from a partially unzipped container pack on Holsinger's hip. Ptlm. Akers testified that Holsinger eventually admitted the bottle contained methamphetamine and that the drugs were his. Ptlm. Akers also testified that Holsinger was carrying additional baggies containing a crystal-like substance, which Holsinger admitted was methamphetamine. Ptlm. Akers testified that in his experience, people carry drugs in multiple baggies when they are transporting them for sale and distribution to multiple people. Later, Holsinger admitted to Det. Bollinger that the "crystal" in the pill bottle was his. Laboratory testing revealed that the crystal-like substances recovered contained methamphetamine. Although Ptlm. Akers testified that the substances collectively weighed 25 grams and laboratory testing indicated they weighed 20.87 grams, plus or minus .2 grams, both weights are within the range specified in R.C. 2925.03(C)(1)(d).

{¶31} The fact that Holsinger indicated the methamphetamine was for use by himself and others at a party did not preclude a finding that he transported the methamphetamine when he knew it was intended for sale or resale by him. The jury did not have to believe the drugs were for personal use. Moreover, Holsinger did not say that he intended to give the drugs to the other people at the party for free, and even if he had, for purposes of R.C. 2925.03, a "sale" includes a "gift." R.C. 3719.01(U) (defining a "sale"); R.C. 2925.01(A) (as used in R.C. Chapter 2925, "sale" has the same meaning as

in R.C. 3719.01). Based on the foregoing, we conclude the conviction on Count Three was not against the manifest weight of the evidence.

### E. Conclusion on Fourth Assignment of Error

{¶32} Having concluded the convictions on Counts One, Two, and Three were not against the manifest weight of the evidence, we overrule the fourth assignment of error.

### V. REAGAN TOKES LAW

{¶33} In his first assignment of error, Holsinger contends that the trial court erred when it sentenced him under the Reagan Tokes Law because it is unconstitutional. The Reagan Tokes Law encompasses four newly enacted statutes and amendments to 50 existing statutes. R.C. 2901.011. Relevant here, the Reagan Tokes Law requires that a court imposing a prison term under R.C. 2929.14(A)(1)(a) or (2)(a) for a first or second degree felony committed on or after March 22, 2019, impose a minimum prison term under that provision and a maximum prison term determined under R.C. 2929.144(B). R.C. 2929.144(A) and (C). There is a presumption that the offender "shall be released from service of the sentence on the expiration of the offender's minimum prison term or on the offender's presumptive earned early release date, whichever is earlier." R.C. 2967.271(B). A presumptive earned early release date is a date determined under procedures described in R.C. 2967.271(F) which allow the sentencing court to reduce the minimum prison term under certain circumstances. R.C. 2967.271(A)(2).

{¶34} R.C. 2967.271(C) states that the Ohio Department of Rehabilitation and Correction ("ODRC") may rebut the presumption in R.C. 2967.271(B) if it determines, at a hearing, that one or more of the following applies:

> (1) Regardless of the security level in which the offender is classified at the time of the hearing, both of the following apply:

(a) During the offender's incarceration, the offender committed institutional rule infractions that involved compromising the security of a state correctional institution, compromising the safety of the staff of a state correctional institution or its inmates, or physical harm or the threat of physical harm to the staff of a state correctional institution or its inmates, or committed a violation of law that was not prosecuted, and the infractions or violations demonstrate that the offender has not been rehabilitated.

(b) The offender's behavior while incarcerated, including, but not limited to the infractions and violations specified in division (C)(1)(a) of this section, demonstrate that the offender continues to pose a threat to society.

(2) Regardless of the security level in which the offender is classified at the time of the hearing, the offender has been placed by the department in extended restrictive housing at any time within the year preceding the date of the hearing.

(3) At the time of the hearing, the offender is classified by the department as a security level three, four, or five, or at a higher security level.

If ODRC rebuts the presumption, it "may maintain the offender's incarceration" after the expiration of the minimum prison term or presumptive earned early release date for a reasonable period of time, determined and specified by ODRC, which "shall not exceed the offender's maximum prison term."  R.C. 2967.271(D)(1).

### A.  Standard of Review

{¶35} The constitutionality of a statute presents a question of law we review de novo.  *Hayslip v. Hanshaw*, 2016-Ohio-3339, 54 N.E.3d 1272, ¶ 27 (4th Dist.).  " '[L]aws are entitled to a strong presumption of constitutionality.' "  *Ohio Renal Assn. v. Kidney Dialysis Patient Protection Amendment Commt.*, 154 Ohio St.3d 86, 2018-Ohio-3220, 111 N.E.3d 1139, ¶ 26, quoting *Yajnik v. Akron Dept. of Health, Hous. Div.*, 101 Ohio St.3d 106, 2004-Ohio-357, 802 N.E.2d 632, ¶ 16.  "A party may challenge a statute as unconstitutional on its face or as applied to a particular set of facts."  *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37.  "A party asserting a facial

challenge * * * must prove beyond a reasonable doubt 'that no set of circumstances exists under which the act would be valid.' " *Ohio Renal Assn.* at ¶ 26, quoting *Wymsylo v. Bartec, Inc.*, 132 Ohio St.3d 167, 2012-Ohio-2187, 970 N.E.2d 898, ¶ 21.

{¶36} In this case, Holsinger asserts a facial challenge to the Reagan Tokes Law but concedes that he did not raise this challenge at the trial level. " '[T]he question of the constitutionality of a statute must generally be raised at the first opportunity and, in a criminal prosecution, this means in the trial court.' " *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 15, quoting *State v. Awan*, 22 Ohio St.3d 120, 122, 489 N.E.2d 277 (1986). However, a reviewing court has "discretion to consider a forfeited constitutional challenge to a statute" and "may review the trial court decision for plain error, but we require a showing that but for a plain or obvious error, the outcome of the proceeding would have been otherwise, and reversal must be necessary to correct a manifest miscarriage of justice." (Citation omitted.) *Id.* at ¶ 16. "The burden of demonstrating plain error is on the party asserting it." *Id.* The Supreme Court of Ohio has also "stated that a forfeited constitutional challenge to a statute is subject to review 'where the rights and interests involved may warrant it.' " *Id.,* quoting *In re M.D.*, 38 Ohio St.3d 149, 527 N.E.2d 286 (1988), syllabus.

{¶37} Holsinger suggests we should not apply plain error review because the reason trial counsel did not challenge the Reagan Tokes Law is "because at the time of sentencing this Court had ruled multiple times the issue of Reagan Tokes was not ripe for review." At the time Holsinger was sentenced, this court rejected challenges to the constitutionality of the Reagan Tokes Law such as his, which relate to R.C. 2967.271, in direct appeals of convictions and prison sentences on the ground that the challenges

were not ripe for review. *E.g.*, *State v. Long*, 4th Dist. Pickaway No. 20CA9, 2021-Ohio-2672, ¶ 1-2, 8, 13, *reversed and remanded*, *In re Cases Held for the Decision in State v. Maddox*, 167 Ohio St.3d 409, 2022-Ohio-1352, 193 N.E.3d 553, ¶ 1. A few months after Holsinger was sentenced, the Supreme Court of Ohio held in *State v. Maddox*, 2022-Ohio-764, ___ N.E.3d ___, ¶ 22, that "a criminal defendant's challenge to the constitutionality of R.C. 2967.271 is ripe for review on the defendant's direct appeal of his or her conviction and prison sentence."

{¶38} The record in this case is silent as to why trial counsel did not make a constitutional challenge to the Reagan Tokes Law. Even if our prior decisions influenced trial counsel, Holsinger cites no legal authority for the position that our prior decisions somehow excuse trial counsel's failure to raise the constitutional issue such that plain error review does not apply. Nothing about our prior decisions precluded trial counsel from raising a constitutional challenge to the Reagan Tokes Law in order to preserve it pending determination of the ripeness issue by the Supreme Court of Ohio. Therefore, we review the first assignment of error under the plain error standard of review.

## B. Separation of Powers

{¶39} Holsinger contends that the Reagan Tokes Law is unconstitutional because it "vests sentencing power in the Executive Branch" in violation of the separation of powers doctrine. He asserts that in *State ex rel. Bray v. Russell*, 89 Ohio St.3d 132, 729 N.E.2d 359 (2000), the Supreme Court of Ohio invalidated "a statutory scheme that allowed prison officials to punish prisoners for their misconduct by extending their prison sentence." He asserts that ODRC's ability under R.C. 2967.271(C)(1)(a) "as a part of the Executive Branch of the Ohio government, to decide that [he] violated a law is the very

definition of encroachment on the powers of the Judicial Branch, and is just what was held to be unconstitutional actions in *Bray*."

**{¶40}** Holsinger has failed in his burden to show that the Reagan Tokes Law violates the separation of powers doctrine on its face. His separation of powers argument is similar to one we rejected in *State v. Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607, ¶ 41-44 (4th Dist.). He does not address *Bontrager* or offer any reason for us to revisit it.

### C. Access to Counsel

**{¶41}** Holsinger also contends that the Reagan Tokes Law is unconstitutional because it "fails to afford" him "access to an attorney at any disciplinary hearing while he is [in] ODRC's custody." He asserts that it violates his "procedural due process rights to be denied access to counsel at every disciplinary hearing and the hearing to determine whether he can be released at his minimum prison term, and each hearing thereafter if his incarceration is continued."

### 1. General Principles

**{¶42}** The Due Process Clause in the Fourteenth Amendment to the United States Constitution states: "No State shall * * * deprive any person of life, liberty, or property, without due process of law * * *." The Due Course of Law Clause in Article I, Section 16 of the Ohio Constitution provides: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay." "The two clauses provide equivalent due process protections." *State v. Wheatley*, 2018-Ohio-464, 94 N.E.3d 578, ¶ 28 (4th Dist.), citing *State v. Aalim*, 150 Ohio St.3d 489, 2017-Ohio-2956, 83 N.E.3d 883, ¶ 15.

**{¶43}** "The Due Process Clause applies when government action deprives a person of liberty * * *." *Greenholtz v. Inmates of Nebraska Penal & Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). "Once it is determined that due process applies, the question remains what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id.* "[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). At minimum, due process requires "the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews* at 333, quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

### 2. Liberty Interest

**{¶44}** "A liberty interest may arise from the Constitution itself, by reason of guarantees implicit in the word 'liberty,' or it may arise from an expectation or interest created by state laws or policies." (Citations omitted.) *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.E.2d 174 (2005). "Because the Reagan Tokes Law creates a presumption of release after service of an offender's minimum sentence, * * * it creates a liberty interest implicating due process rights." *State v. Stenson*, 6th Dist. Lucas No. L-

20-1074, 2022-Ohio-2072, ¶ 25.  Therefore, the question becomes what process is due when the government deprives an offender of this liberty interest.

### 3.  Process Due

**{¶45}** Holsinger has not shown that due process requires that the state provide inmates access to an attorney at all R.C. 2967.271(C) hearings and underlying disciplinary hearings or that the absence of a provision in the Reagan Tokes Law providing such access renders it facially unconstitutional.  Holsinger asserts that "in Ohio, a person subject to a civil commitment is entitled [to] be represented by counsel, including court appointed counsel" "because a civil commitment implicates a loss of liberty."  He asserts that "[t]his is no different than what Reagan Tokes contemplates by allowing ODRC to continue the incarceration of an inmate based upon an allegation the inmate committed a violation of law that was not prosecuted."

**{¶46}** Holsinger's suggestion that the process due in civil commitment proceedings and in proceedings to maintain incarceration under the Reagan Tokes Law should be the same because both situations involve a deprivation of liberty is not well-taken.  The fact that both situations involve government action which deprives a person of liberty means only that the Due Process Clause applies to both situations, *Greenholtz*, 442 U.S. at 7, 99 S.Ct. 2100, 60 L.E.2d 668, and does not answer the question of what process is due when the government maintains an offender's incarceration under R.C. 2967.271.  Holsinger fails to articulate any reason why due process demands that offenders facing continued confinement under the Reagan Tokes Law receive the same process due persons facing civil commitment.

{¶47} Holsinger also asserts that in *Vitek v. Jones*, 445 U.S. 480, 100 S.Ct. 1254, 63 L.E.2d 552 (1980) ("*Vitek*"), the United States Supreme Court held that an inmate who challenged the constitutionality of a statute which allowed prisoners to be transferred to a mental hospital was entitled to certain rights, including the availability of legal counsel, because the involuntary transfer to a psychiatric hospital implicated his liberty. Holsinger claims "[t]hat is no different than the facts of this case" because continuing his incarceration after the expiration of his minimum sentence "clearly would be an involuntary hold from [his] perspective."

{¶48} In *Vitek*, a Nebraska inmate was transferred to a state mental hospital pursuant to a state statute. *Vitek* at 483-484. A federal district court declared the statute unconstitutional as applied to the inmate and permanently enjoined the state from transferring him to the state mental hospital without following the procedures prescribed in its judgment. *Id.* at 485. The procedures included "[a]vailability of legal counsel, furnished by the state, if the inmate is financially unable to furnish his own." *Id.* at 495, quoting *Miller v. Vitek*, 437 F.Supp.569, 575 (D.C.Neb. 1977).

{¶49} The Supreme Court affirmed the judgment of the district court with modification. *Id.* at 497. The Supreme Court agreed with the district court that the involuntary transfer implicated a liberty interest that is protected by the Due Process Clause. *Id.* at 487-488. The Supreme Court also approved most of procedures prescribed by the district court. *Id.* at 494-497.

{¶50} However, the Supreme Court did not approve of the legal counsel requirement. Four justices did not reach the issue because they concluded either that the case was moot, *id.* at 500-501 (Stewart, J., dissenting, joined by Chief Justice Burger

and Justice Rehnquist), or not ripe for review, *id.* at 501-506 (Blackmun, J., dissenting). Four other justices agreed the district court went "beyond the requirements imposed by prior cases by holding that counsel must be made available to inmates facing transfer hearings if they are financially unable to furnish their own" and that the Supreme Court had "not required the automatic appointment of counsel for indigent prisoners facing other deprivations of liberty." *Id.* at 496 (White, J., joined by Justices Brennan, Marshall, and Stevens). Those justices also agreed that the Supreme Court had "recognized that prisoners who are illiterate and uneducated have a greater need for assistance in exercising their rights" and that it was "appropriate that counsel be provided to indigent prisoners whom the State seeks to treat as mentally ill" because "[a] prisoner thought to be suffering from a mental disease or defect requiring involuntary treatment probably has an even greater need for legal assistance, for such a prisoner is more likely to be unable to understand or exercise his rights." *Id.* at 496-497. However, they agreed to modify the district court's opinion to conform with the separate opinion of Justice Powell. *Id.* at 497.

{¶51} Justice Powell observed that it was "unlikely that an inmate threatened with involuntary transfer to mental hospitals will possess the competence or training to protect adequately his own interest in these state-initiated proceedings." *Id.* at 498 (Powell, J., concurring in part). He agreed that "qualified and independent assistance must be provided to an inmate who is threatened with involuntary transfer to a state mental hospital." *Id.* at 497. However, he did not agree that the requirement of qualified and independent assistance demanded "that a licensed attorney be provided." *Id.* at 497. He concluded such assistance "may be provided by a licensed psychiatrist or other mental

health professional" and "would not exclude * * * the possibility that the required assistance may be rendered by competent laymen in some cases." *Id.* at 500.

{¶52} Holsinger's reliance on *Vitek* is misplaced. Even if inmates facing continued incarceration under the Reagan Tokes Law were due the same process as inmates threatened with involuntary transfer to a state mental hospital under *Vitek*, as explained above, *Vitek* requires only the provision of qualified and independent assistance, not a licensed attorney. *Id.* at 497. Moreover, *Vitek* did not hold that the absence of a provision for qualified and independent assistance in the Nebraska statute at issue in that case rendered it *facially unconstitutional*. Rather, *Vitek* affirmed with modification the district court judgment which declared the statute unconstitutional *as applied to the inmate in that case*, who was transferred without such assistance. *See id.* at 485, 497. Thus, *Vitek* does not support the position that the state must provide access to an attorney at all R.C. 2967.271(C) hearings and underlying disciplinary hearings or that the absence of a provision in the Reagan Tokes Law providing such access renders it facially unconstitutional.

{¶53} For these reasons, we conclude Holsinger has failed in his burden to show the Reagan Tokes Law violates procedural due process on its face because it fails to afford access to counsel.

### D. Additional Arguments

{¶54} Holsinger argues that the Reagan Tokes Law is unconstitutional because it does not require that the state prove to a jury beyond a reasonable doubt the basis for maintaining an inmate's incarceration. This argument is beyond the scope of the first assignment of error so we need not address it. *See State v. Nguyen*, 4th Dist. Athens

No. 14CA42, 2015-Ohio-4414, ¶ 41 (an appellate court reviews "assignments of error and not mere arguments"). However, we observe that in *State v. Chapman*, 4th Dist. Ross No. 21CA3742, 2022-Ohio-2853, ¶ 77, we recently held that "the Reagan Tokes Law does not violate the constitutional right to a jury trial."

**{¶55}** Holsinger also suggests that even if a jury trial is not required, the Reagan Tokes Law violates due process because it does not require a judge to make the decision to maintain incarceration. Even if we construed this argument to be within the scope of the first assignment of error, in *Bontrager*, we rejected the contention that due process requires that the sentencing court, rather than ODRC, conduct the R.C. 2967.271(C) hearing and make the decision whether to maintain the offender's incarceration. *Bontrager*, 2022-Ohio-1367, 188 N.E.3d 607, at ¶ 48. Holsinger does not address *Bontrager* or offer any reason for us to depart from it.

**{¶56}** Holsinger also argues that even if a judge does not have to make the decision to maintain incarceration, the Reagan Tokes Law is unconstitutional because it does not contain a presumption of innocence, require proof beyond a reasonable doubt, grant inmates rights to confront and subpoena witnesses, allow inmates to appeal an ODRC decision to maintain incarceration, or provide inmates with appointed counsel if the state appeals an ODRC decision to release an inmate on the inmate's presumptive release date. These arguments are beyond the scope of the first assignment of error so we need not address them. *See Nguyen* at ¶ 41.

E.  Conclusion on First Assignment of Error

**{¶57}** Holsinger failed to show the Reagan Tokes Law is unconstitutional on its face.  Thus, he has not shown the trial court erred, let alone committed plain error, when it sentenced him under that law.  Accordingly, we overrule the first assignment of error.

VI.  CONSECUTIVE SENTENCES

**{¶58}** In his second assignment of error, Holsinger contends that the trial court failed to make the proper findings to order consecutive sentences under R.C. 2929.14(C)(4).  Holsinger asserts that the trial court must make the findings at sentencing and incorporate them into the sentencing entry, and there is "no mention of the necessary findings in the sentencing entry."  Therefore, he asks us to vacate his consecutive sentences and order that his sentences run concurrent with each other.

**{¶59}** Under R.C. 2953.08(A)(4) "a defendant who is convicted of or pleads guilty to a felony may appeal as a matter of right the sentence imposed upon the defendant" on the ground that "[t]he sentence is contrary to law."  "The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under [R.C. 2953.08] or may vacate the sentence and remand the matter to the sentencing court for resentencing" "if it clearly and convincingly finds" that the record does not support certain findings by the sentencing court, including consecutive sentence findings under R.C. 2929.14(C)(4), or "[t]hat the sentence is otherwise contrary to law."  R.C. 2953.08(G)(2).

**{¶60}** R.C. 2929.14(C)(4) states:

> If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness

of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

* * *

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶61} "In order to impose consecutive terms of imprisonment, a trial court is required to make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry * * *." *State v. Bonnell*, 140 Ohio St.3d 209, 2014-Ohio-3177, 16 N.E.3d 659, ¶ 37. However, the court "has no obligation to state reasons to support its findings" and has no obligation "to give a talismanic incantation of the words of the statute, provided that the necessary findings can be found in the record and are incorporated into the sentencing entry." *Id.* at ¶ 37. "A failure to make the appropriate R.C. 2929.14(C)(4) findings renders a consecutive sentence contrary to law." *State v. Brickles*, 4th Dist. Pickaway No. 19CA16, 2021-Ohio-178, ¶ 7. However, "[a] trial court's inadvertent failure to incorporate the statutory findings in the sentencing entry after properly making those findings at the sentencing hearing does not render the sentence contrary to law; rather, such a clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Bonnell* at ¶ 30.

{¶62} Holsinger's consecutive sentences are not contrary to law because the trial court made the requisite findings at the sentencing hearing. The trial court stated:

[I]n finding that the 2929.14 requirements that have been satisfied in order to run the time consecutive in this case, the history, I think is very, very clear that the Prosecutor has went over on convictions of Mr. Holsinger in the past and time served, in that consecutive terms are necessary to protect the public from future crimes [sic]. It is also to punish the offender in this case

for a history of drug trafficking issues in this community, and now one more set of charges that have been convicted by a jury [sic]. Consecutive sentences are not disproportionate to the seriousness of the offender's conduct in this case, and to the danger that he poses to the public. Uhm, also that the Court finds that the offender's criminal history demonstrates consecutive sentences are necessary to protect the public from future claims or crimes by the offender * * *.

Thus, the court found that (1) consecutive service was necessary to protect the public from future crime and to punish Holsinger (even though it only had to make one of those two findings under R.C. 2929.14(C)(4)), (2) consecutive sentences were not disproportionate to the seriousness of Holsinger's conduct and to the danger he posed to the public, and (3) Holsinger's history of criminal conduct demonstrated that consecutive sentences are necessary to protect the public from future crime by him, see R.C. 2929.14(C)(4)(c). Although Holsinger suggests the record does not support these findings, he presented no argument to that effect. And while the trial court failed to incorporate these findings into the sentencing entry, this "clerical mistake may be corrected by the court through a nunc pro tunc entry to reflect what actually occurred in open court." *Bonnell* at ¶ 30.

{¶63} For the foregoing reasons, we overrule the second assignment of error. However, pursuant to App.R. 9(E), we instruct the trial court to issue a nunc pro tunc sentencing entry which includes the court's consecutive sentence findings. *See State v. Williams*, 4th Dist. Adams No. 19CA1090, 2019-Ohio-4873, ¶ 14 (similarly instructing a trial court); App.R. 9(E) ("If anything material to either party is omitted from the record by error or accident or is misstated * * * the court of appeals, on proper suggestion or of its own initiative, may direct that omission or misstatement be corrected * * *").

## VII.  CONCLUSION

**{¶64}** Having overruled the assignments of error, we affirm the trial court's judgment.  However, pursuant to App.R. 9(E), we instruct the trial court to issue a nunc pro tunc sentencing entry which includes the court's consecutive sentence findings.

JUDGMENT AFFIRMED
WITH INSTRUCTIONS.

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED WITH INSTRUCTIONS and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court


BY: _____
       Michael D. Hess, Judge




### **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**